**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

TINILLE JENKINS,                                 *

     Plaintiff,                                   *

                                                  *

v.                                               *

                                                  *   Civil No. 22-3108-BAH

UNIV. OF MD. CAPITAL REGION HEALTH,              *

     Defendant.                                   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM OPINION

Tinille Jenkins ("Plaintiff" or "Jenkins") brought suit against University of Maryland Capital Region Health ("Defendant" or "UMCRH") alleging discrimination and failure to accommodate under the Americans with Disabilities Act (ADA) and the Maryland Fair Employment Practices Act ("FEPA") and retaliation under the ADA. ECF 1. Pending before the Court is Defendant's motion for summary judgment (the "Motion"). ECF 38. The memorandum in support of the Motion, as well as numerous exhibits, were filed under seal. ECF 39. Plaintiff filed an opposition, ECF 40, and Defendant filed a sealed reply, ECF 44.[1] All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below,

---

[1] Plaintiff also filed the memorandum in opposition to the motion, as well as numerous exhibits, under seal. ECF 41.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

Defendant's Motion is **GRANTED**. In addition, the two pending motions to seal, ECF 37 and ECF 43, are **GRANTED**.[3]

## I.    BACKGROUND

This Court, in ruling on a motion for summary judgment, reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party.[4] *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).

In March 2019, Plaintiff was hired at UMCRH, which is an affiliate of the University of Maryland Medical System, to work as a medical technologist ("Med Tech"). ECF 39-3 (confirmation of employment offer terms), at 2. Plaintiff was advised in writing that she would work at multiple locations, with her primary location being Bowie Health Center. *Id.* The Bowie Health Center is a freestanding 24-hour emergency room medical facility that serves over 40,000 patients each year. *See* ECF 39-1, at 8 (citation omitted).

The primary responsibilities of the position were discussed during Plaintiff's interview. *See* ECF 39-2 (Jenkins Dep.), at 22, 54:10–14. Plaintiff was hired as a PRN Med Tech, which meant she "work[ed] as needed," *id.* at 23, 55:3–19, and was often scheduled to work shifts when regular, full-time, or part-time Med Techs were not available or when a last-minute fill-in was

---

[3] Due to the granting of the motions to seal, many of the filings referenced in this opinion are sealed. Though the Court has drafted this opinion to avoid as much sensitive material as possible, the memorandum opinion will be initially filed under seal. The parties shall have twenty-one (21) days from its issuance to file a position, under seal, on what portions of the opinion must remain under seal. The Court intends to issue a public version of this opinion with necessary redactions after reviewing any submissions from the parties. The Court's accompanying implementing Order will not be filed under seal.

[4] The Court notes that under Rule 56(c)(3), the Court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56.

needed. ECF 39-5 (Awojoodu[5] Aff.), at 2–4 ¶¶ 4, 5, 10, 16. On March 22, 2019, Plaintiff received

and signed a document titled "Position Description," which listed the "primary responsibilities" of

her new position. *See* ECF 39-4 (medical technologist position description form), at 2; *see also*

ECF 39-2, at 30, 85:3–16 (testifying that Plaintiff received, reviewed, and understood the contents

of the position description form and the confirmation of employment offer terms). The "position

summary" indicates that the Med Tech "provides routine and specialized laboratory testing in a

timely manner for patient care [and] [p]erforms duties independently with minimum supervision."

ECF 39-4, at 2. As relevant here, the "principal duties" listed on the form include: "performs

routine and specialized laboratory testing in their assigned specialty area following all standard

operating procedures," "correlates laboratory findings with disease states; integrates and relates

data from other laboratory specialty areas; confirms abnormal results and resolves specimen and

testing discrepancies[,] institutes appropriate follow-up measures for unusual test results,"

"troubleshoots most routine technical and analytical problems including specimen collection

problems within minimal supervision," "performs testing on proficiency testing samples as

required," and "assures tests are completed in a timely manner." *Id.*

When asked to describe the essential functions of a Med Tech, Plaintiff testified that "[t]he

essential functions are to run patient samples [and] calibrate machinery." ECF 39-2, at 13, 42:18–

43:3. Running patient samples is often referred to as "calling" or "reading" slides or specimen.

*See id.* at 24–25, 65:16–66:8. Calling or reading slides includes reviewing a patient's sample under

a microscope and reporting the observations and/or analysis of that particular sample. *See id.* at

25–26, 66:21–67:4. Plaintiff confirmed that "reading slides correctly and quickly and relaying

---

[5] Florence Awojoodu is the Laboratory Manager at UMCRH. ECF 39-5, at 2 ¶ 2. Awojoodu "oversaw the daily operations" of Plaintiff's department during Plaintiff's employment with UMCRH. *Id.* at 3 ¶ 11.

that information to healthcare providers was an important [] and vital part of [her] job." *See id.* at 27–28, 75:19–76:9.

After beginning work in April 2019, Plaintiff successfully completed her 90-day probationary period, which included an assessment of her competency "on the four benches."[6] ECF 41-3 (supplemental pages from Jenkins Dep.), at 66; 308:20–309:9; ECF 41-4 (supplemental pages from Awojoodu Dep.), at 12–14, 23:15–25:1. During her probationary period, Plaintiff maintains that she was not required to demonstrate competency to read differentials, also known as "calling slides." ECF 41-4, at 25–27, 47:14–49:10; ECF 41-9 (email from Awojoodu to Jones-Walker[7] dated March 29, 2020), at 2. Awojoodu clarified in her affidavit that Plaintiff "was not observed calling any slides independently" during Plaintiff's first 90 days. ECF 39-5, at 3 ¶ 14. Based on her hire date, Plaintiff completed her probationary period as of July 7, 2019. ECF 39-3, at 3.

On July 30, 2019, Denisha Walker, UMCRH's Technical Specialist for Hematology, determined that Plaintiff had inaccurately identified abnormal cells in a patient's specimen sample that preliminarily indicated cancer.[8] *See* ECF 39-8 (Walker Aff.), at 3 ¶¶ 6, 7 (explaining that Plaintiff made a "serious error" by calling abnormal cells in a patient's sample, which could have resulted in "misdiagnosis and mistreatment" had it not been caught by the pathologist who received the sample). Walker then approached Plaintiff to try to "understand [her] rationale" in identifying

---

[6] The four benches in the lab are hematology, coagulation, chemistry, and urinalysis. ECF 41-4, at 11, 22:16–21.

[7] Jouene Jones-Walker is the manager of human resources operations at UMCRH. ECF 39-21, at 2.

[8] In plain terms, Plaintiff identified cells that were not present in the patient's sample.

4

an abnormal cell, but Plaintiff was "unable to identify the cells she had previously called and provided to the pathologist." *Id.* ¶ 7.

Walker relayed her concerns to Plaintiff and reiterated UMCRH's expectations that "all Med Techs be cognizant of calling patient slides accurately."[9] *Id.* ¶ 8. Walker also notified Plaintiff's supervisors, Sharon Haas and Awojoodu, of her concern over Plaintiff's accuracy in calling slides. *See* ECF 39-9 (Walker Dep.), at 3–4, 22:14–23:18; *see also* ECF 39-10, at 2. There is no evidence that Walker "discovered any additional errors related to calling slides" during Plaintiff's shifts after the July 30, 2019 event, ECF 41, at 10 (citing ECF 41-5, at 31–32, 82:13–83:8),[10] and Plaintiff remained on the schedule taking shifts. *See* ECF 39-7 (shift schedules), at 2–6. The Court notes, however, that neither party disputes Plaintiff's inaccurate slide calling during subsequent competency assessments. *See* ECF 41, at 11 (acknowledging that Plaintiff "did not pass the differential portion [in the September 2019 assessment] which involved reading a

---

[9] Plaintiff asserts that "[t]here is no documentation of Walker reviewing this error with Jenkins or communicating UMCRH's expectation that Jenkins should be more aware of immature cells." ECF 41, at 10. To be clear, Walker testified that while there was not "an official document of sorts," she did review the slide with Plaintiff, consistent with her expressed intention to do so in her July 30, 2019 email to Awojoodu. *See* ECF 41-5 (supplemental pages from Walker Dep.), at 9, 23:3–21 ("Q: Did you, in fact, review that slide with [Plaintiff]? A: Yes, I did."); *see also* ECF 39-10 (Walker's July 30, 2019 email to Awojoodu), at 2 ("Please confirm [Plaintiff] is working Wednesday night and I will come in early on Thursday morning to review with her."). In addition, as noted above, Walker affirmed in her affidavit that she relayed her concerns to Plaintiff and reiterated job expectations after the July 30 incident. ECF 39-8, at 3 ¶ 8.

[10] The Court notes that the testimony on this point is arguably ambiguous. When asked "were you ever contacted by anyone [] to advise you that a specimen – any test performed by [Plaintiff] on a specimen was incorrect [after the September 2019 test]?" Walker responded: "I can't attest to that." Then, when subsequently asked whether she received any reports that patient care had been delayed on a shift Plaintiff had worked, Walker replied: "I cannot recollect – give a definitive answer on that." ECF 41-5, at 32, 83:2–17. Drawing all reasonable inferences in favor of Plaintiff, and in the absence of evidence to the contrary, the Court will assume that Walker did not discover any additional errors during Plaintiff's shifts from the September 2019 test to the beginning of her administrative leave in December 2019.

manual differential"); *see also id.* at 12 (noting that Plaintiff "recalls that some, but not all of the slides [Walker and Plaintiff] reviewed [in the October 2019 assessment] were incorrect").

On September 19, 2019, Walker conducted competency assessments of all Med Techs at Bowie Health Center, including Plaintiff. ECF 39-8, at 3 ¶ 9. The assessment included both a written competency assessment and a differential review.[11] *Id.* According to Plaintiff's own testimony, the assessments given to staff in September did not include a timed assessment. ECF 41-3, at 66, 308:5–15; *see also* ECF 39-8, at 3 ¶ 9 (indicating that each Med Tech received the same differential to review and was provided two weeks to submit their callings (or findings)). During the assessment, Plaintiff called a large number of abnormal cells that were not present. ECF 39-8, at 4 ¶ 11 (affirming that Plaintiff's findings were "quite concerning as it was the second time [Walker] observed Plaintiff call abnormal cells that were non-existent on the slide"); ECF 41-9, at 2 (explaining that when reviewing the September assessment, Plaintiff's differential "was so far off, [Awojoodu] questioned if a different slide was given [to Plaintiff] than the rest of the staff").

Haas and Awojoodu decided that Plaintiff should be individually assessed by Walker after the July 30 incident and the results of her September 2019 assessment. ECF 39-5, at 4 ¶ 21. Plaintiff met with Walker at Capital Region Medical Center on three occasions, October 22, October 25, and November 1 of 2019. *See* ECF 39-2, at 40, 141:10–12; at 44, 153:12–19; at 46, 162:6–13. On October 22, 2019, Walker met with Plaintiff and assigned Plaintiff ten slides to call

---

[11] A differential review consists of a Med Tech "review[ing] a slide with a patient's blood or body fluid sample to analyze the cells and prepare[] a diagnostic of the cells." *See* ECF 39-1, at 12 n.4 (citing ECF 39-9, at 7–8, 72:18–73:3).

in a one-hour period.[12]  *See* ECF 39-8, at 4 ¶ 14; *see also* ECF 39-2, at 41–42, 142:21–143:16.

According to Walker, the slides were "typical of those that a new hire would receive for a

competency assessment." ECF 39-8, at 4 ¶ 14.  Plaintiff, however, failed to complete her review

of all ten slides within the hour allotted.  *Id.*  After sitting with Plaintiff and going through the

slides she had completed, it "became clear to [Walker] that Plaintiff could not consistently or

accurately identify or describe the cells on the slides." *See id.*; *see also* ECF 39-13 (Walker's

November 13, 2019, email documenting Plaintiff's results), at 2 (explaining that upon reviewing

the first five slides, "it was revealed that [Plaintiff] could not correctly identify and/or describe

consistently and accurately immature cells[.]").

     After that first visit, Walker made the following observations in a follow-up email to

Awojoodu and Haas: Plaintiff's "knowledge and understanding of cells (immature) is deficient. I

am very concerned about her working in [h]ematology." *See* ECF 39-11 (Walker's October 23,

2019 e-mail), at 2.  On October 25, 2019, Walker and Plaintiff met for a second time to continue

her competency assessment and to review the same ten slides she was given on October 22.  ECF

39-8, at 4 ¶ 15; *see also* ECF 39-2, at 44–45, 153:20–154:1.  This time, Plaintiff "not only was []

unable to explain her rationale but she could no longer identify the same cells that she had

identified three days prior." ECF 39-8, at 4–5 ¶ 15.  Plaintiff alleges that she felt "bull[ied] [and]

cast down" in the interaction with Walker.  ECF 41-3, at 39, 184:1–3.

     Plaintiff met with Walker for the last session on November 1, 2019, and was assigned a

computer-based, virtual manual differential assessment.  ECF 41-3, at 32, 163:5–8; at 33–35,

164:4–166:20.  Walker provided Plaintiff with three virtual slides to analyze from the College of

---

[12] According to Walker, the industry standard for calling slides is five minutes per slide.  *See* ECF
39-8, at 5 ¶ 20.

American Pathologists ("CAP"). ECF 39-8, at 5 ¶ 16. Walker gave Plaintiff an hour to work on three slides. *Id.* When Walker returned to check on Plaintiff's progress, she discovered that "out of the fifteen cells located within the three virtual slides, Plaintiff missed seven of them." *Id.* Walker noted that when calling out slides, Plaintiff "appeared to have very little confidence as if she were guessing because she would call a slide and follow it with a[n] 'I guess' statement." *Id.*

On November 11, 2019, Walker reached out to Awojoodu to provide her with Walker's feedback and report the results of the three days of assessments. *Id.* ¶ 17; *see also* ECF 39-12 (Walker's November 11, 2019 e-mail), at 2; ECF 39-13, at 2. Awojoodu, Haas, and Walker determined that, in the interest of patient care and safety, Plaintiff should no longer independently call slides. ECF 39-5, at 5 ¶ 23; *see also* ECF 39-12, at 2. On November 13, 2019, Haas and Awojoodu met with Plaintiff to relay Walker's findings and explain that her job duties were restricted until she could demonstrate competency. ECF 39-5, at 5 ¶ 23; *see also* ECF 39-2, at 47–50, 174:20–177:16. Plaintiff was given the following restrictions: (1) when Plaintiff was working with another Med Tech, the other Med Tech would call all slides, and (2) when Plaintiff was working alone, all slides would be sent to UM Capital Region Medical Center for a Med Tech at that location to perform the slide review. ECF 39-5, at 5 ¶ 23; *see also* ECF 39-14 (November 14, 2019 meeting minutes), at 3. During a staff meeting held on November 14, the staff was informed of the new protocols for Plaintiff.[13] ECF 39-14, at 3. Plaintiff understood this process to be a "temporary step" but that the intention would be to "move[] forward to essentially go back to the regular routine." ECF 41-3, at 48, 212:2–7. Plaintiff testified that she was "not sure as to what

---

[13] According to Plaintiff, there is "no record documenting any occasion a co-worker had to perform a differential for [her,] nor was there a record of any occasion when Jenkins had to send a patient's specimen to PG Hospital for testing after November 14, 2019." ECF 41, at 16 (citing ECF 41-4, at 43, 78:9–20).

8

the next steps were . . . [but] was led to believed that [she] would [] eventually resume[] normal practices." *Id.* at 50, 214:13–20. Haas and Awojoodu provided Plaintiff with a document outlining Walker's findings and their concerns with Plaintiff's performance and competency. ECF 39-15 (signed competency assessment), at 2; ECF 39-2, at 47, 174:20–176:15. Plaintiff reviewed and signed the document to confirm acknowledgment and receipt of the concerns with her competency. ECF 39-5, at 5 ¶ 23; ECF 39-15, at 2. As of the time Plaintiff received and signed the document, which was before she disclosed her disability, the plan going forward was to provide additional training to Plaintiff. *See* ECF 41-3, at 65, 298:3–10 ("At that particular time, it was my understanding that initial – subsequent[] steps would be taken in addition to this temporary way that I was supposed to deal with patients' hematology slides that required differentials."); ECF 41-4, at 36–38, 65:16–67:8. Awojoodu testified that the plan was to provide training "until the next day when [Plaintiff] turned in her [accommodations request] document[,] [a]t that point [Awojoodu] had to talk to HR." ECF 41-4, at 38, 67:5–8; *see also* ECF 41-5, at 22, 54:9–18 (testifying that "[p]rior to the meeting and [Plaintiff] disclosing her disability, [the next step] would be additional training" but after Plaintiff identified her disability, Walker was "instructed to wait to hear back from HR before scheduling further time").

On November 14, 2019, Plaintiff informed Awojoodu and Haas that she suffered from ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and submitted a letter disclosing the same, indicating that her condition contributed to her poor performance on her assessment with Walker. *See* ECF 39-16 (Plaintiff's November 14, 2019 disability disclosure letter), at 2. In her letter, Plaintiff requested an accommodation and wrote, "[u]nfortunately, the PG hematology training tactics that I experience[d] recently without accommodations have appeared to cause issues." *Id.* Consistent with UMCRH's Reasonable Accommodation of Individuals with Disabilities Policy, Awojoodu

9

immediately notified Human Resources Manager Jouene Jones-Walker and Employee Health Nurse Linda Dailey of Plaintiff's communication and request. *See* ECF 39-5, at 5–6 ¶ 25; *see also* ECF 39-17 (Awojoodu's November 15, 2019 e-mail), at 2.

After speaking with Awojoodu and Haas, Plaintiff submitted a Reasonable Accommodation Request to the Employee Health Office on that same day, November 14. *See* ECF 39-18 (Plaintiff's accommodation request), at 2. She requested "more time for slide reading and processing," "more time to process, respond, input information, counting (reading, writing, speech)," and "more time to process testing [and] reading [and] writing, counting, scope view." *Id.* In the instant lawsuit, Plaintiff clarifies that her request for accommodations "was not related to performance of day-to-day duties as a medical lab technologist, but instead sought accommodations related to competency assessments and timed testing." ECF 41, at 15 (citing ECF 41-3, at 72, 318:4–13). Plaintiff's testimony also emphasizes the limited scope of the accommodations request: "The accommodation request was for future competencies and being tested." ECF 41-3, at 45, 203:15–21. Prior to her November 14, 2019 request for accommodations, Plaintiff testified that she "had not been told or had not heard anything about poor performance with patient care." *Id.* at 46, 204:6–18.

According to the Employee Competency Assessment Policy, retraining and reassessment of competency must occur any time problems are identified with employee performance. *See* ECF 41-6 (Department of Pathology Employee Competency Assessment Policy ("Policy")), at 3 ("Employees who fail any aspect of competency testing must be retrained and retested for the specific failure . . . Employees who repeatedly fail competency assessments may be placed on a full performance improvement plan and/or recommended for disciplinary actions (up to and including termination) for failure to perform job duties at an acceptable level.").

10

Dorcas Kiptepkut, the Employee Health Office Manager, spoke with Awojoodu to determine whether Plaintiff's accommodations were reasonable for a PRN Med Tech. *See* ECF 39-19 (Kiptepkut's December 11, 2019 e-mail), at 2. Awojoodu explained that "a critical part of [Plaintiff's] job is focusing microscopy and identification of cells and since she is primarily by herself at times[,] we cannot make the accommodations." *See id.*

At around the same time, Jones-Walker began her attempts to contact Plaintiff because Plaintiff had not submitted the correct accommodation request forms, which required documentation from a physician. *See* ECF 39-20 (Jones-Walker's December 10, 2019 e-mail), at 2. On December 20, 2019, the Employee Health Office determined that "Plaintiff presented a danger to patient safety and care, and therefore, she should be placed on paid administrative leave effective December 24, 2019, until further assessment showed that she was competent to do her job." ECF 39-1, at 16 (citing ECF 39-21, at 2).

The Employee Health Office continued their attempts to communicate with Plaintiff, including on December 26, 2019, when Kiptepkut e-mailed the Health Care Provider Assessment Form to Plaintiff. ECF 39-22 (Kiptepkut's December 27, 2019 e-mail), at 2. Kiptepkut met with Plaintiff the following week to review her job description and discuss possible accommodations. ECF 39-1, at 16 (citing ECF 39-2, at 57, 199:3–7; ECF 39-22, at 2). On January 14, 2020, Plaintiff returned the physician-completed forms related to her accommodation request. *See* ECF 39-23 (healthcare provider assessment forms).

One medical report stated, in part, that Plaintiff needs "to take tests without time limits or with maximum extra time in a quiet place away from the rest of the group," and she will "require extra time to complete assignments." ECF 39-24 (certification of disability), at 3. Another medical report, dated August 21, 2019, identified several accommodations Plaintiff should be afforded to

11

"function at her full potential in a medical school program" including a separate testing room, extended time on tests, access to a quiet study room, and an audio reader for tests. ECF 41-8, at 10.

On February 6, 2020, Jones-Walker offered Plaintiff the opportunity to transfer to another position within the UMCRH system as an accommodation. ECF 39-2, at 64–66, 230:5–232:8 (testifying that she [Plaintiff] was presented with alternative phlebotomist and admin positions but was not given specific locations for those positions or job descriptions). Plaintiff also testified that she "liked [her] job as a Med Tech and [she] was educated as a Med Tech and [she] would like to continue [her] job as a Med Tech[, but] that did not take off the table any additional jobs that may be presented." *Id.* at 67–68, 233:18–234:1. During that meeting, or around that time, Plaintiff asked to be re-assessed and requested that she be provided additional time to interpret slides as an accommodation. *See id.* at 68–69, 234:17–235:13. UMCRH then granted her a second assessment to determine whether the requested accommodations would allow her to call slides accurately and efficiently. *See id.* at 69, 235:14–19.

On February 27, 2020, Plaintiff completed another assessment with her requested accommodation of extended time. ECF 39-2, at 70, 240:17–20. Plaintiff was given 20 slides and provided eight minutes per slide, as opposed to the industry standard of five minutes per slide, which resulted in an additional hour to complete the competency exam. ECF 39-26, at 2. At the end of the allotted time, Plaintiff had completed only 50% (10/20) of the slides. *Id.* Of the ten slides Plaintiff completed, she was able to correctly read eight. *Id.* She scored a 55% on the February assessment, which was 30% below the pass rate of 85%. ECF 39-8, at 6 ¶ 21; ECF 39-2, at 71, 244:2–13.

Plaintiff alleges that, in setting up the February 2020 competency assessment, UMCRH "ignored the recommended accommodations related to testing detailed by Jenkins's medical providers." ECF 41, at 17 (citing ECF 41-4, at 51, 88:1–14 and ECF 41-5, at 25–27, 57:9–59:7). Plaintiff further alleges that the decision to provide Plaintiff eight minutes to complete each manual differential was not based on a "discussion with Jenkins regarding accommodations she had received under other testing conditions." *Id.* (citing ECF 41-3, at 77, 325:1–6).

On March 23, 2020, Jones-Walker met with Plaintiff to review the results of her second competency assessment. *See* ECF 39-2, at 71, 244:16–247:9; *see also id.* at 75, 248:12–249:16. Jones-Walker informed Plaintiff that she could not work as a Med Tech given her failure to timely and accurately call slides, and then discussed other opportunities within UMCRH, but Plaintiff declined to consider other non-Med Tech positions. *See id.* at 77–78, 253:7–254:3. In a letter dated May 22, 2020, Jones-Walker explained in writing that Plaintiff's requested accommodation could not be granted because "the amount of additional time required to correctly interpret slides . . . would cause delayed results which directly impacts patient care." ECF 39-26, at 3. Jones-Walker then again offered Plaintiff "the opportunity to transfer to another position within [UMCRH]." *Id.* Plaintiff's employment ended effective on or about May 29, 2020. *See* ECF 39-2, at 79, 261:3–5; *see also* ECF 39-26.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

13

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott*, 550 U.S. at 378, and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins.*

14

*Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

### A.   Motions to Seal

The Court first addresses the motions to seal. *See* ECFs 37 and 43. Defendant moves to seal its memorandum of law in support of the Motion, as well as exhibits A through CC, pursuant to the stipulated protective order, ECF 32, and to protect "internal communications related to its business operations that are considered proprietary information," and to keep confidential "Plaintiff's personal identifying information and/or protected health information." ECF 37, at 1–2. Defendant maintains that "[t]his information is sensitive in nature and confidential, and there is no alternative to sealing that would provide it sufficient protection." *Id.* at 2. Plaintiff does not oppose Defendant's motion to seal, ECF 42, and in fact, "joins in [Defendant's] request for the same reasons and as applicable to [Plaintiff's] same documents." *Id.* Plaintiff moves to seal her memorandum of law in opposition to Defendant's Motion, the statement of material facts in dispute, and exhibits 1–17, because the documents "contain[] confidential information as defined by the Protective Order," and "[r]edaction of the sensitive information would nullify the relevance of the documents." ECF 43, at 1–2.

Under Local Rule 105.11, "[a]ny motion seeking the sealing of . . . motions, exhibits[,] or other documents to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." The common law presumes that the public has a right to inspect judicial records and documents. *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988). This presumption of access, however, may be overcome if competing interests outweigh the interest in access. *Id.*

"[W]hen a district court is presented with a request to seal certain documents, it must determine two things: (1) whether the documents in question are judicial records to which the common law presumption of access applies; and (2) whether the documents are also protected by the more rigorous First Amendment right of access." *Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 316 (D. Md. 2014) (citing *In re Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013)). "[T]he non-moving party must be provided with notice of the request to seal and an opportunity to object. This requirement may be satisfied . . . by docketing the motion reasonably in advance of deciding the issue." *Butler*, 47 F. Supp. 3d at 316 (internal quotations and citations omitted). Before sealing, the Court must consider less drastic alternatives. *Id.*

As relevant here, sealing may be appropriate where the parties "demonstrate[] that the materials at issue [contain] highly sensitive and protected health information of the plaintiff, and that the public's right of access to such information is substantially outweighed by the compelling interest in protecting the details of such information from public disclosure." *Howald v. Ben Lippen Sch.*, Civ. No. 21-cv-59, 2023 WL 27900, at *1 (W.D.N.C. Jan. 3, 2023). Further, a corporation "may possess a strong interest in preserving the confidentiality of its proprietary and trade-secret information, which in turn may justify partial sealing of court records." *See Doe v. Public Citizen*, 749 F.3d 246, 269 (4th Cir. 2014); *see also Butler*, 47 F. Supp. 3d at 317 (holding documents can remain under seal "because they contain confidential and proprietary business information and/or were produced from employee personnel files that contain sensitive personal and commercial information").

The parties have complied with procedural requirements, and the Court finds that the documents contain confidential and proprietary business information, as well as Plaintiff's

16

personal identifying information and protected health information. Because the memoranda and exhibits contain a significant amount of confidential information, redaction is not a viable option. Moreover, there is no opposition to the motions to seal by the adverse party or any other interested party. Accordingly, the Court concludes that sealing these materials is narrowly tailored to serve the interest of protecting the confidential and sensitive nature of the information contained therein. The motions to seal at ECFs 37 and 43 are granted.

### B.    Motion for Summary Judgment

Defendant argues that summary judgment is appropriate for the following reasons: (1) Plaintiff fails to establish a prima facie case of disability discrimination or failure-to-accommodate; (2) even if Plaintiff can establish a prima facie case, Defendant produced evidence of its legitimate and nondiscriminatory reasons for discharging Plaintiff; and 3) Plaintiff has produced no evidence of pretext. ECF 39-1. Defendant also contends that summary judgment is appropriate on Plaintiff's retaliation claim under the ADA because Plaintiff fails to establish a prima facie case of retaliation, and even if the claim meets the prima facie elements, Defendant has produced legitimate, non-retaliatory reasons for Plaintiff's discharge and Plaintiff has failed to produce any evidence of pretext. *Id.* The Court will address each argument in turn.

### 1.    Disability Discrimination (ADA and FEPA)

In her first claim, Plaintiff contends that Defendant discriminated against her on the basis of her disability, in violation of the ADA and FEPA.[14] Under the ADA, a plaintiff must establish

---

[14] Under the ADA, an employer is prohibited from "discriminat[ing] against a qualified individual on the basis of disability...." 42 U.S.C. § 12112(a). Such unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." *Id.* § 12112(b)(5)(A). FEPA similarly prohibits employers from "fail[ing] or refus[ing] to make a reasonable accommodation for the known disability of an otherwise qualified employee." Md. Code Ann., State Gov't § 20-606(a)(4).

that she (1) is a "qualified individual with a disability;" (2) was "discharged;" (3) was "fulfilling [her] employer's legitimate expectations at the time of discharge;" and (4) the "circumstances of [her] discharge raise a reasonable inference of unlawful discrimination."[15] *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n.9 (4th Cir. 2004) (internal quotations omitted)). Plaintiff must satisfy each of the above elements to survive summary judgment.

Plaintiff fails to establish, as a threshold matter, that she is a qualified individual with a disability under the first element. In analyzing an ADA discrimination claim, a plaintiff must first establish that she is a "qualified individual with a disability" under the provisions of the Act. *Shin v. Univ. of Md. Med. Sys. Corp.*, 396 F. App'x. 472, 479 (4th Cir. 2010); *Rhoads v. FDIC*, 257 F.3d 373, 387 (4th Cir. 2001). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position[.]" 42 U.S.C. § 12111(8). Therefore, to survive summary judgment on an ADA claim, a plaintiff must "produce evidence showing that [s]he is both qualified and disabled." *Shin*, 369 F. App'x. at 479. The burden is on the plaintiff to prove that she can perform the essential functions, and if not, that a "reasonable accommodation by the employer would enable [her] to perform those functions." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir. 1993)). Defendant does not dispute that Plaintiff has a disability within the meaning of the ADA. *See* ECF 39-1, at 22. However, Plaintiff has

---

[15] "FEPA, as the Maryland state analog to federal anti-discrimination statutes, prohibits substantially the same conduct as the ADA." *Nelson-Rogers v. Kaiser Permanente*, Civ. No. GJH-17-3326, 2020 WL 917067, at *17 n.6 (D. Md. Feb. 25, 2020). "Thus, courts generally treat the analysis of claims under the ADA and FEPA as coterminous." *Id.* (collecting cases). Here, Plaintiff alleges that the same conduct violated both the ADA and FEPA, thus the Court will analyze these claims together.

18

failed to produce evidence that she could perform the essential functions of her employment position with or without reasonable accommodation.

    *i.    Essential Functions*

"Essential functions" are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). More specifically, the essential functions of a job are those that "bear more than a marginal relationship to the job at issue." *Tyndall*, 31 F.3d at 213 (internal citations omitted). The ADA identifies two factors that inform whether a function is essential. First, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

The applicable regulations also provide additional guidance on the essential-function inquiry and identify seven factors that are "evidence of whether a particular function is essential": "the employer's judgment as to which functions are essential," "written job descriptions prepared before advertising or interviewing applicants for the job," "the amount of time spent on the job performing the function," "the consequences of not requiring the incumbent to perform the function," "the terms of a collective bargaining agreement," "the work experience of past incumbents in the job," and "the current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3)(i)-(vii). The Fourth Circuit has clarified that "none of those seven factors [are] dispositive," and moreover, "the list of factors is not exhaustive." *Stephenson v. Pfizer, Inc.*, 641 F. App'x. 214, 220 (4th Cir. 2016). Additionally, as relevant here, "a written job description prepared after advertising or interviewing applicants for the job could be relevant evidence of

whether a particular function is essential." *Id.* (citing *Basith v. Cook Cnty*, 241 F.3d 919, 928 (7th Cir. 2001) (using job description created after hiring as evidence of essential functions)).

According to Defendant, the "essential functions" of a PRN Med Tech include "review[ing] and accurately interpret[ing] patient slides—typically alone during odd shifts other Med Techs could not take—and timely provid[ing] the analysis of those patient slides back to the provider so that the patient could be treated accordingly." ECF 39-1, at 22. According to Plaintiff, "a factfinder could reasonably conclude that reading differentials was not an essential function on the shift Jenkins worked a majority of the time because it occurred very infrequently." ECF 41, at 23. In support of this argument, Plaintiff cites Awojoodu's testimony that "she had no record of any instance when another medical technologist had to read a differential for Jenkins or any instance when Jenkins had to leave a differential for the next shift to process." *Id.* (citing ECF 41-4, at 43, 78:9–20, at 52, 91:1–12). But Plaintiff's own testimony is fatal to her claim. When asked what the essential functions of her job were, Plaintiff responded: "[t]he essential functions are to run patient samples, calibrate machinery. Those are the big essentials."[16] ECF 39-2, at 13, 43:1–3; *see also id.* at 28, 76:5–9 (testimony by Plaintiff affirming that "reading slides correctly and quickly and relaying that information to healthcare providers was an important [] and vital part of [her] job").

Additionally, the record evidence clearly establishes that calling slides is an essential function of a Med Tech's job. On March 22, 2019, Plaintiff received and signed a document titled "Position Description," which listed the "primary responsibilities" of her new position. *See* ECF 39-4, at 2; *see also* ECF 39-2, at 30, 85:3–16 (testifying that Plaintiff received, reviewed, and

---

[16] Plaintiff was also asked at another point during her deposition: "did anyone talk to you about what the general objectives of a med tech in your position would be?" Plaintiff responded: "[t]o analyze patient specimens, to calibrate machinery." ECF 39-2, at 22, 54:10–14.

understood the contents of the position description form and the confirmation of employment offer terms). The "position summary" indicates that the Med Tech "provides routine and specialized laboratory testing in a timely manner for patient care [and] [p]erforms duties independently with minimum supervision." ECF 39-4, at 2. Even assuming the written job description was prepared after Plaintiff was interviewed, the fact that calling slides (*i.e.*, performing routine and specialized laboratory testing, correlating laboratory findings with disease states, integrating and relating data from other laboratory specialty areas, confirming abnormal results, resolving specimen and testing discrepancies, and instituting appropriate follow-up measures for unusual test results) was listed under "principal duties" is relevant evidence that it is an essential function. *Id.* Additionally, both Awojoodu and Walker affirmed that timely and accurate reading of patient slides is an essential function and duty of a Med Tech at Bowie Health Center, ECF 39-5, at 3 ¶¶ 6, 7, ECF 39-8, at 6 ¶ 23, and it is well-established that "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). Additionally, Awojoodu explained that "as a PRN ("as needed") Med Tech, Plaintiff was often scheduled to work by herself and therefore no one could assist her or check her analysis of patient slides to verify its accuracy." ECF 39-5, at 6 ¶ 26; *see* 29 C.F.R. § 1630.2(n)(2)(ii) (explaining that a job "function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed"). Thus, "Plaintiff [was] expected to call slides in a timely and accurate fashion." ECF 39-5, at 6 ¶ 26.

Plaintiff avers that "there were medical technologist functions that did not require reading slides, [but] UMCRH did not consider placing Jenkins in such a role or identifying such opportunities." ECF 41, at 17. However, Plaintiff's citations to the record, largely to her own

deposition and affidavit,[17] fail to reflect that such a position actually existed. *See* ECF 41-2 (Jenkins Aff.), at 3–4 ¶ 13 (stating that plaintiff "asked HR staff, Jouene Jones-Walker and Margaret Fisher, if there were any available medical lab technologist positions at Prince George's Hospital that [Plaintiff] could work in [] that did not require [Plaintiff] to read differentials" but reflecting that Plaintiff did "not receive a direct response to that question and instead was told that working as a medical lab technologist was not an option"); ECF 41-3, at 55–56, 230:5–231:17 (noting that Plaintiff was offered "phlebotomy and admin positions"); *id.* at 58–63, 253:13–258:15 (noting that Plaintiff was not offered an alternative position to serve "as a med technician or a med technologist" but not discussing whether there were other medical technologist opportunities that did not require reading slides); *id.* at 78–80, 326:19–328:17 (noting that Plaintiff was told she "would not be able to work at any medical technologist jobs" but not discussing whether such jobs existed that did not require the reading of slides). Plaintiff also cites to several pages of Walker's deposition. *See* ECF 41, at 17 (citing ECF 41-5, at 6–8, 13:20–15:20). However, the cited portion of Walker's deposition does not appear to support Plaintiff's assertion and instead reflects a back

---

[17] The Fourth Circuit has observed that "courts have 'long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'" *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). "Rather, if such an affidavit is 'based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts.'" *Id.* (citation omitted). However, Plaintiff's opinion that other "medical technologist" positions existed that did not require the reading of slides, does not, in fact, generate a dispute of material fact as to whether such a position existed because the assertion was not based on personal knowledge or firsthand experience. *See Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) (noting that "[a]lthough [the Court] do[es] not make credibility determinations at the summary judgment phase, [the Court] should also not find a genuine dispute of material fact based solely on [a party's] self-serving testimony"); *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion."). As described in more detail above, the portions of the record Plaintiff cited to in an attempt to substantiate this opinion do not establish that such a position existed. Thus, this assertion is insufficient to create a genuine dispute of material fact.

and forth over the difference between medical technicians and medical technologists without discussing the assertion that there were opportunities for Plaintiff to serve as a technologist but not be required to read slides.

On the other hand, the "position description" document, submitted by Defendant and signed by Plaintiff at the beginning of her employment, details the primary duties of Med Techs and indicates that calling slides is a primary duty. *See* ECF 39-4, at 2 (listing principal duties as: "performs routine and specialized laboratory testing in their assigned specialty area following all standard operating procedures," and "correlates laboratory findings with disease states; integrates and relates data from other laboratory specialty areas; confirms abnormal results and resolves specimen and testing discrepancies[.]").

Plaintiff also offers a conclusory statement that reading slides was not an essential function because it occurred infrequently, ECF 41, at 23, but the record contains no evidence to support this contention, either. Instead, the record shows that the position description for her job included reading (or calling) slides under "principal duties," ECF 39-4, at 2, Plaintiff acknowledged in her testimony that reading patient slides was a "vital" part of her job, ECF 39-2, at 28, 76:5–9, both Awojoodu and Walker affirmed that timely and accurate reading of patient slides is an essential function and duty of a Med Tech, ECF 39-5, at 3 ¶¶ 6, 7, ECF 39-8, at 6 ¶ 23, and after it was determined that Plaintiff could not accurately read slides, temporary restrictive measures had to be implemented for slide-calling during Plaintiff's shifts, which included re-distributing slides to other employees. ECF 39-5, at 5 ¶ 23. Under these circumstances, no reasonable jury could conclude that reading slides was not an essential function of Plaintiff's position as a PRN Med Tech. *See EEOC v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 592 (4th Cir. 2015) (affirming district court's finding that lifting more than 20 pounds was an essential function

of the job based on the employer's job description, the judgment of the managers, the experience of other employees as described through deposition testimony, and the proffered consequences of removing all heavy-lifting tasks from an employee's duties, namely that other employees would have "to work harder and longer" as a result).

Having found that calling slides is an essential function of Plaintiff's job, the Court now turns to whether Plaintiff could call slides with or without reasonable accommodations.

ii.      *Performing Essential Functions With or Without Reasonable Accommodations*

It is clear from the record that Plaintiff could not call slides—in either a testing environment or in her day-to-day work—without reasonable accommodations. Indeed, the uncontroverted evidence shows Plaintiff made a mistake in calling a slide on July 30, 2019, ECF 39-8, at 3 ¶¶ 6, 7, and then subsequently failed several competency assessments. *Id.* at 4 ¶ 11; *id.* at 4–5 ¶¶ 14–17; ECF 39-15, at 2. The question, therefore, is whether Plaintiff could call slides efficiently and accurately *with* a reasonable accommodation.

Before turning to whether Plaintiff could call slides with reasonable accommodations, the Court must identify the requested accommodations at issue. However, the parties appear to dispute the scope of Plaintiff's requested accommodations. In the form requesting accommodations, Plaintiff wrote the following: "I need more time for slide reading and processing," "more time to process, respond, input information, counting (reading, writing, speech)," and "I need more time to process testing [and] reading [and] writing, counting, scope view." ECF 39-18, at 2.

Plaintiff argues that she only requested *testing* accommodations, not day-to-day accommodations while performing her job. ECF 41, at 20 (indicating that Defendant "inaccurately interpreted [Plaintiff's] request as seeking more processing time to complete her day-to-day responsibilities"). The medical documentation submitted by Plaintiff's physicians recommended

that Plaintiff be allowed "to take tests without time limits or with maximum extra time in a quiet place away from the rest of the group." *See* ECF 39-24, at 3; *see also* ECF 41-8, at 10 (explaining that Plaintiff's accommodations should include a separate testing room, extended time on tests, access to a quiet study room, and an audio reader for tests).

Defendant counters that "whether Plaintiff likes it or not, [the] requested accommodations [are] for regular work not just testing accommodations." ECF 44, at 9 (citing ECF 39-18, at 2). In support of its argument, Defendant notes: "[t]o be clear, needing 'more time for slide reading and processing,' 'processing time,' 'more time to process, respond, input information counting' are all aspects of the essential functions of a Med Tech, not just for when a Med Tech is sitting for an assessment." *Id.* (citing ECF 39-4). Defendant also avers that "[t]he top three sections of Plaintiff's request say nothing about needing these accommodations for testing environments only." *Id.* (emphasis removed).

The Court, consistent with its obligation, views the evidence in the light most favorable to Plaintiff and evaluates the requested accommodations according to Plaintiff's theory of the case— namely that she required only testing-related accommodations, not work-related accommodations.[18] *See* ECF 41, at 25, 26–27. But even viewing the evidence in the light most

---

[18] The Court notes that to the extent Plaintiff also requested work-related accommodations for calling slides, including more time (or unlimited time) to process slides in a quiet environment, this accommodation is unreasonable as a matter of law. Defendant observes that "[a]llowing Plaintiff an undefined, extended period of time to analyze patient samples would endanger patient care and safety." ECF 39-1, at 31 (citing ECF 39-5 and ECF 39-8). Plaintiff's essential functions as a PRN Med Tech "required her to review and accurately interpret patient slides – typically alone during odd shifts other Med Techs could not take – and timely provide the analysis of those patient slides back to the provider so that the patient could be treated accordingly." *Id.* at 22 (citing ECF 39-4, at 2 and ECF 39-2, at 27–28, 75:19–76:9). According to Defendant, Plaintiff's request for "more time for slide reading and processing," and "more time to process, respond, input information[, and] counting" is "impossible to provide," because "Plaintiff worked in an emergency medical center wherein time is of the essence, timely review of patient slides is a necessity, and [there is no] quiet and controlled environment to review slides." *Id.* The Court

25

favorable to Plaintiff, the Court finds that Plaintiff is not qualified for the position as a matter of law.

The deficiency in Plaintiff's ability to call slides centers on two factors: 1) inaccurate slide-reading; and 2) inability to call slides in a timely manner. It is undisputed that Plaintiff failed to call slides in an accurate or timely manner during the competency assessments administered by Walker in October and November 2019 without reasonable accommodations. ECF 39-15, at 2; ECF 41, at 12–13. However, even after Plaintiff was given her requested accommodation— additional time in a quiet room—on a second competency test, she was not able to complete all of the slides in the allotted extended time, resulting in a 55% on the assessment. ECF 39-8, at 6 ¶ 21; ECF 39-2, at 71, 244:2–13. Even considering the evidence in the light most favorable to Plaintiff, no reasonable juror could find that Plaintiff could perform an essential function of her job—calling slides—with reasonable accommodations, given that she was unable to pass a competency assessment even with additional time in a quiet room to process and call slides. *See* ECF 39-8, at 6 ¶ 23 ("[E]ven when Plaintiff was given the accommodation requests during her assessments, she still could not perform the peripheral differentials and cell identification with accuracy and within industry guidelines[.]").

Plaintiff asserts that the only accommodation she requested was accommodation related to testing and the Court finds that Defendant *granted* that accommodation. *See* ECF 41, at 25, 26–

---

agrees. Defendant, as a matter of law, was not required to provide Plaintiff with such an accommodation given the nature and function of her job. *See* 42 U.S.C. § 12113(b) (explaining that the ADA does not require the employer to accommodate an individual if the employee would pose a direct threat to the health or safety of others); *see also Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x at 595 (explaining that the ADA does not require employers to "reallocate essential functions" to other employees). However, because Plaintiff maintains that she only requires testing-related accommodations, not work-related accommodations, the Court will cabin its analysis accordingly.

27. Plaintiff does not dispute that she was allowed to re-test in February 2020 with additional time

to complete the competency assessment. *See* ECF 41, at 16 (acknowledging that UMCRH "agreed

to give [Plaintiff] another competency assessment in a quiet location"). However, Plaintiff asserts

that requiring her to take a timed assessment with extended time, rather than an untimed

assessment, was an unreasonable failure to accommodate. ECF 41, at 27. This argument fails as

a matter of law.

Critically, "[t]he ADA requires reasonableness, not perfection." *Tartaro-McGowan v.

Inova Home Health, LLC*, 91 F.4th 158, 171 (4th Cir. 2024). "And as long as the employer's

chosen accommodation is reasonable, even if not perfect, [the court's] inquiry is at an end—'not

even a well-intentioned court may substitute its own judgment for the employer's choice.'" *Id.* at

167 (quoting *Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1012 (4th Cir. 2020)). In

addition, the Fourth Circuit has emphasized that "what will serve as a reasonable accommodation

in a particular situation may not have a single solution, but rather, many possible solutions."

*Elledge*, 979 F.3d at 1011.

Plaintiff's medical documents recommended, as relevant here, "tests without time limits or

with maximum extra time in a quiet place away from the rest of the group," ECF 39-24, at 3, and

"extended time on tests, access to a quiet study room, and [an] audio reader for tests." ECF 41-8,

at 10. In Plaintiff's own words, she requested "more time for slide reading and processing," "more

time to process, respond, input information, counting (reading, writing, speech)," and "more time

to process testing [and] reading [and] writing, counting, scope view." ECF 39-18, at 2. Defendant

granted Plaintiff's request for a testing accommodation when it agreed to administer another

competency assessment in February 2020 with extended time for Plaintiff to complete the

assessment. ECF 39-2, at 69, 235:1–19, at 70, 240:17–20; ECF 39-26, at 2. Plaintiff was given

20 slides and provided eight minutes per slide, as opposed to the industry standard of five minutes per slide, which resulted in an additional hour to complete the competency exam. *See* ECF 39-26, at 2. Even with the requested accommodation of "more time for slide reading and processing," Plaintiff nonetheless failed the assessment. ECF 39-18, at 2; ECF 39-8, at 6 ¶ 21; ECF 39-26, at 2. As previously established, the Fourth Circuit has made clear that the employer is obligated to accommodate reasonable requests, but not necessarily the precise request fashioned by Plaintiff. *See Reyazuddin v. Montgomery Cnty, Md.*, 789 F.3d 407, 415 (4th Cir. 2015) ("An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested."). The Court finds that one hour of extended time on a competency assessment was a reasonable accommodation given that Plaintiff requested "more time," ECF 39-18, at 2, and the accompanying medical documentation proposed tests without time limits *or extra time*. ECF 39-24, at 3; ECF 41-8, at 10.

Further, Plaintiff does not explain why administering an untimed test would be "reasonable" as that term is defined under the ADA by 42 U.S.C. § 12111(9). Plaintiff has failed to explain how a testing accommodation, absent a concurrent work-related accommodation, would allow her to perform the essential functions of her job as an emergency room Med Tech. In other words, it is not clear that a testing accommodation, even if it allowed Plaintiff to successfully pass the test, would solve the underlying issue regarding Plaintiff's failure to accurately and timely call slides while performing her job responsibilities in the emergency room.[19] *See Parker v. Children's Nat'l Med. Ctr. Inc*, No. 20-cv-3523, 2024 WL 943438, at *19 n.9 (D. Md. Mar. 4, 2024) ("To the extent Plaintiff argues that Defendant refused to accommodate her request to work from home

---

[19] Defendant observes that "[a]llowing Plaintiff an undefined, extended period of time to analyze patient samples would endanger patient care and safety." ECF 39-1, at 31 (citations omitted).

during the snowstorm, Plaintiff does not provide evidence that providing such an accommodation would have addressed her alleged pregnancy-related work impairments."); *Chughtai v. Kaiser Permanente*, Civ. No. PX-15-2963, 2018 WL 3049198, at *5 (D. Md. June 20, 2018) (granting summary judgment on plaintiff's failure to accommodate claim where "no record evidence supports that such an extension would have provided a reasonable accommodation to address the limitations arising from [Plaintiff's] thrombophilia"). Because performance on the test bears directly on Plaintiff's ability to successfully call slides day-to-day, no reasonable juror could conclude that indefinite time to call a slide is a reasonable work-related accommodation. Plaintiff frequently worked alone in an emergency room where patients required timely and accurate care. *See* ECF 39-5, at 6 ¶ 26; ECF 39-4, at 2; *see also Shin*, 369 F. App'x. at 481 (holding that a medical resident was not qualified because, *inter alia*, he could not provide "safe and appropriate care for patients"); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 687 (4th Cir. 1997) (concluding that a salesperson who experienced epileptic seizures was unable to perform the essential security function of his job, and no reasonable accommodation was possible because the plaintiff was sometimes solely responsible for the security of the store, and when he had a seizure, he was unable to provide security). There is no evidence to conclude that had Plaintiff been accommodated with unlimited time for testing, she would have been able to perform the essential functions of her job on a day-to-day basis, which required calling slides accurately *and in a timely manner*. *See Wilson v. Dollar General Corp.*, 717 F.3d 337, 346 (4th Cir. 2013) ("[T]here is simply no evidence to conclude that had [Plaintiff] been accommodated with his two-day leave request, he would have been able to perform the essential functions of his job at the conclusion of the leave period."); *Kumagah v. Aldersgate United Methodist Retirement Cmty, Inc.*, No. 22-cv-41, 2022 WL

17970566, at *6 (W.D.N.C. Dec. 27, 2022) ("The Court fails to see how Plaintiff would have been able to perform the essential functions of her job had Defendant granted her request in full.").

There is no genuine dispute that Defendant granted Plaintiff additional time to call slides during the February 2020 competency assessment and Plaintiff nonetheless failed to complete all of the slides in the assessment. ECF 39-26, at 2; ECF 39-2, at 71, 244:6–13. Of the slides she did complete, Plaintiff erroneously called two out of the ten slides. ECF 39-26, at 2. As previously established, calling slides is an essential function of a Med Tech's duties. ECF 39-4, at 2. The evidence undisputedly shows that even with an extra three minutes per slide (which resulted in an additional hour for the entire exam), Plaintiff was unable to accurately and timely complete this essential job function. ECF 39-26, at 2. The Court also notes that, as evidenced by Plaintiff's own testimony, the September 2019 competency assessment was *untimed*. *See* ECF 41-3, at 66, 308:5–15; *see also* ECF 39-8, at 3 ¶ 9 (indicating that each Med Tech received the same differential to review and was provided two weeks to submit their callings (or findings)). In light of the above, Plaintiff has failed to prove that she can perform the essential functions of her job without a reasonable accommodation or that a reasonable accommodation by the employer would enable her to perform those functions.[20] *Tyndall*, 31 F.3d at 213.

Because Plaintiff could not meet industry standards in calling slides, even with reasonable testing accommodations, the Court finds that Plaintiff is not a qualified individual with a disability, as defined in the ADA. *See Shin*, 369 F. App'x. at 481 (finding Plaintiff was not performing the

---

[20] The Court is unpersuaded by Plaintiff's argument that the "competency test was not an assessment of her ability to perform the essential functions of her position." ECF 41, at 26. The competency assessment tested Plaintiff's ability to call slides. And, as previously established, calling slides was an essential function of her position as a Med Tech. Accordingly, no reasonable juror could conclude that Plaintiff could accurately call slides while performing her shift, despite repeatedly failing to do so during a competency assessment. It is axiomatic that one's ability to call slides during a test is directly related to one's ability to call slides on a day-to-day basis.

essential elements of his job where Plaintiff "order[ed] the wrong medications for several patients, [and] his poor judgment in critical situations forced his supervisors to step in and prevent several errors"). Plaintiff must satisfy each element of a prima facie case of disability discrimination to survive summary judgment. As Plaintiff is not a "qualified individual," Defendant is entitled to judgment as a matter of law on Plaintiff's claim of disability discrimination under the ADA and FEPA.

### iii.    Meeting Legitimate Expectations of Employer

Even if calling slides was not an essential function or Plaintiff could establish that she could call slides with a reasonable accommodation, Plaintiff nonetheless failed to establish element three—namely, that her performance met the legitimate expectations of her employer at the time of discharge. According to Defendant, Plaintiff "took multiple, standardized assessments and could not meet industry standards to meet the expectations of a Med Tech." ECF 39-1, at 23.

"The 'legitimate expectations' factor is distinct from the inquiry into the 'essential functions of a job.'" *Rubino v. New Acton Mobile Indus.*, 44 F. Supp. 3d 616, 623 (D. Md. 2014) (quoting *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 61–62 (4th Cir. 1995)). "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

There is no dispute that as a PRN Med Tech, Plaintiff was "scheduled to perform the duties of a medical lab technologist, mostly alone." ECF 41, at 22. Plaintiff asserts that "Jenkins never received any performance-related discipline." *Id.* But meeting expectations—not avoiding discipline—is the standard, and the evidence makes clear that there were temporary restrictive measures put in place after Plaintiff failed the October and November 2019 competency

31

assessments. ECF 39-5, at 5 ¶ 23; *see also* ECF 39-14, at 3; ECF 39-15, at 2. Plaintiff also contends that "[e]ven after spending 3 sessions with Walker in October and November 2019 to review hematology slides, UMCRH continued to schedule Jenkins to work alone." ECF 41, at 22. Again, ample evidence shows that Plaintiff was not to conduct slide reading on her shifts after she failed the October and November 2019 assessments. *See* ECF 39-14, at 3; ECF 39-15, at 2. Neither of these assertions demonstrate that Plaintiff was meeting the legitimate expectations of her employer; on the contrary, there is unrebutted evidence that temporary restrictions were put in place to protect against Plaintiff's inaccurate slide calling while Plaintiff was still working shifts by herself.

Plaintiff also asserts that "UMCRH did not identify one instance when during the course of working a shift, Jenkins failed to review and accurately interpret a patient slide and timely provide the analysis." ECF 41, at 19. Plaintiff then, somewhat confusingly, states that, "in the one instance when Jenkins made such an error, it was treated as being so insignificant that neither Jenkins'[s] immediate supervisor nor the lab manager documented the error." *Id.* at 19–20. As a clarifying point, the Court notes that despite Plaintiff's statement to the contrary, the evidence in the record clearly shows that Plaintiff failed to accurately interpret a patient slide on July 30, 2019. ECF 39-8, at 3 ¶¶ 6, 7; ECF 39-10, at 2. Indeed, this very error, identified by Walker, triggered the subsequent follow-up assessments and course of action currently at issue in this litigation. Moreover, even viewing the evidence in the light most favorable to Plaintiff, it is simply not accurate to state, as Plaintiff does, that the July 30, 2019, incident was "so insignificant" that the supervisors failed to document it, given that multiple exhibits attached to Defendant's motion for summary judgment reveal that Walker documented the error and conducted outreach and follow-up with Plaintiff's supervisors regarding her concerns about Plaintiff's ability to call slides. *See*

32

ECF 39-9, at 3–4, 22:14–23:18; *see also* ECF 39-10, at 2.  Subsequent follow-up testing then undisputedly confirmed that Plaintiff was not accurately calling slides, even with reasonable accommodations.  ECF 39-15, at 2; ECF 39-26, at 2.

Defendant has cited ample evidence showing that Plaintiff could not accurately call slides at the time of her termination.  Plaintiff, on the other hand, offers only general assertions to the contrary that are unsupported by the record.  ECF 41, at 21–23.  As such, there is no genuine dispute that Plaintiff was not meeting the legitimate expectations of her employer at the time of discharge.  Thus, even if Plaintiff could establish that she was a qualified individual with a disability, she still fails to establish the third element of her prima facie case—that she was meeting her employer's legitimate expectations at the time of her termination.

2.     Failure to Accommodate (ADA and FEPA)

In moving for summary judgment, Defendant contends that, even after discovery, Plaintiff has failed to raise any genuine issue of material fact as to Defendant's alleged failure to accommodate her disability.  ECF 39-1, at 25.  "To survive summary judgment on [a failure-to-accommodate] claim under the ADA, a plaintiff must show (i) she was disabled, (ii) the employer had notice of her disability, (iii) she could perform the essential functions of her position with a reasonable accommodation, and (iv) the employer refused to make such accommodation."  *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022).  "Before opining on the fourth element" of a plaintiff's failure-to-accommodate claim, the court in *Cowgill* recognized that a court "must first consider what accommodation [plaintiff] requested."  *Id.*  The Court finds that Plaintiff cannot establish the third or fourth elements of a prima facie failure to accommodate claim under the ADA or FEPA.[21]

---

[21] As previously noted, FEPA is the "Maryland state analog to federal anti-discrimination statutes," and courts "generally treat the analysis of claims under the ADA and FEPA as coterminous."

Defendant does not dispute that Plaintiff has a disability within the meaning of the ADA or that it had notice of her disability, thus satisfying the first and second prima facie elements. *See* ECF 39-1, at 22. However, Plaintiff has failed to produce evidence to satisfy the third and fourth elements, namely that she could perform the essential functions of her employment position with a reasonable accommodation and that Defendant refused to make Plaintiff's requested accommodation.

As previously established, there is no evidence that Plaintiff could perform the essential functions of her job with a reasonable accommodation, thus defeating the third prima facie element. ECF 39-26, at 2. In addition, the record reveals that Defendant granted Plaintiff's requested testing accommodations, thus preventing Plaintiff from establishing the fourth prima facie element. The evidence shows that Plaintiff requested additional time to process slides and Plaintiff now clarifies that this requested accommodation was specific to testing, rather than day-to-day work responsibilities. *See* ECF 41, at 20, 27 ("[Plaintiff] was not seeking an accommodation related to her day-to-day duties, but only as it related to the manner in which she received training and was tested for competency assessment purposes."). The record demonstrates, and Plaintiff acknowledges, that Defendant *granted* Plaintiff's requested testing accommodation and allowed Plaintiff to re-test in February 2020 in a quiet room with additional time for each slide.[22] ECF 41, at 16–17; ECF 39-26, at 2. Even with the additional time, Plaintiff was unable to accurately call all of the slides or finish the allocated slides in the extended time period. *See*

---

*Nelson-Rogers*, 2020 WL 917067, at *17. Because Plaintiff alleges that the same conduct gave rise to her failure-to-accommodate claims under the ADA and FEPA, the Court analyzes these claims together.

[22] The Court reiterates that Plaintiff repeatedly emphasized in her briefing that she was only seeking an accommodation related to testing. *See* ECF 41, at 20, 27. Thus, that is the only accommodation the Court analyzes.

34

ECF 39-8, at 6 ¶ 21; ECF 39-2, at 71, 244:6–13. Thus, for the same reasons described in the previous section, Plaintiff has failed to establish element three or element four of her failure-to-accommodate claim.

Plaintiff further argues that "before [she] disclosed her disability, the decision had been made that if a manual differential had to be performed on a shift Plaintiff worked alone, that specimen would be left for the next shift," ECF 41, at 21, revealing that, in Plaintiff's view, a "fact finder could reasonably conclude that patient care would not be compromised had Defendant allowed [Plaintiff] to continue working." *Id.* However, it is well-established that "a reasonable accommodation 'does not require an employer to reallocate essential job functions or assign an employee 'permanent light duty.'" *Griffin v. Holder*, 972 F. Supp. 2d 827, 848 (D.S.C. 2013) (quoting *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x. 314, 323 (4th Cir.2011)). "[A]n accommodation that would require other employees to work harder is unreasonable." *Crabill*, 423 F. App'x. at 323 (internal quotation marks and citations omitted) (holding that reducing a school counselor's caseload was not a reasonable accommodation because it would shift her duties to other counselors and increase their workload). Thus, the fact that Defendant created a temporary workaround to address the interim period in which Plaintiff was not cleared to call slides, but was still working shifts, does not create a legal obligation on Defendant to permanently re-assign one of Plaintiff's primary duties to other employees.

Because the undisputed evidence shows that Plaintiff could not perform the essential functions of her job with or without a reasonable accommodation and Defendant did not refuse to

make an accommodation, but in fact, granted Plaintiff's requested testing accommodation, Defendant is entitled to judgment as a matter of law.[23]

### 3.    Legitimate, Non-Discriminatory Reasons for Termination

Even assuming that Plaintiff has established a prima facie claim for disability discrimination and failure-to-accommodate, Defendant is nevertheless entitled to summary judgment because it had a legitimate, non-discriminatory reason for terminating her, and there is no evidence from which a jury could reasonably conclude that this reason was pretextual. Under the *McDonnell Douglas* framework (which Plaintiff relies on here), a plaintiff must first make out "a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). The burden then shifts to the employer, who must establish that there was "a legitimate, nondiscriminatory reason" for the adverse employment action. *Tex. Dep't of Cmty. Affairs. v. Burdine*, 450 U.S. 248, 254 (1981). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves,* 530 U.S. at 142. If the employer discharges its burden, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Id.* at 143 (quotations and citations omitted). Importantly, "[t]he ultimate burden of persuading the trier of fact that the

---

[23] Additionally, the Court declines to address Plaintiff's argument that "UMCRH did not engage in the interactive process in good faith and refused to provide a reasonable accommodation." ECF 41, at 26. "[A]n employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process." *Crabill*, 423 F. App'x. at 323 (citation omitted). The Fourth Circuit has made clear that "the employee must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee." *Id.* Because the Court finds that Defendant granted reasonable testing accommodations in response to Plaintiff's explicit request for testing accommodations, there is no basis to infer that Defendant "fail[ed] to identify an appropriate accommodation," which is a necessary element of maintaining a failure to accommodate claim based on the alleged failure to engage in the interactive process. *Id.*

[employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Defendant notes that it "permitted Plaintiff to take a second assessment where she was afforded her accommodation requests [] and even with these accommodations, Plaintiff failed the assessment." ECF 39-1, at 31 (citing ECF 39-2, at 71, 244:6–13; ECF 39-5, at 6 ¶ 27; ECF 39-8, at 6 ¶ 21). The undisputed evidence confirms that Defendant granted Plaintiff's requested accommodation of "more time" to process slides and allowed Plaintiff extended time in a quiet room to complete the February 2020 competency evaluation. ECF 41, at 16–17; ECF 39-26, at 2. Even after Plaintiff was given her requested accommodations, she still was unable to accurately call slides or finish calling slides within the requisite time period. ECF 39-2, at 71, 244:6–13; ECF 39-5, at 6 ¶ 27; ECF 39-8, at 6 ¶ 21. In short, the competency assessment in February 2020 demonstrated that Plaintiff could not call slides during her shifts because she failed to accurately call slides on the assessment. Because she could not perform this essential function, Defendant offered Plaintiff alternative positions within the hospital system, *see* ECF 39-26, at 3, ECF 39-2, at 77–78, 253:7–254:16, which Plaintiff declined because the positions were not Med Tech positions. *See id.*; *see also* 42 U.S.C. § 12111(9) (stating that under the ADA, a reasonable accommodation may include a reassignment to a vacant position). Plaintiff's failure to complete an essential function of her job with a reasonable accommodation, coupled with her failure to follow-up on Defendant's repeated offers to transfer Plaintiff to an alternative position, is sufficient to show a non-discriminatory reason for termination. The burden then shifts back to Plaintiff to show that the reason for termination was pretextual.

To show the decision was pretextual, Plaintiff asserts that when "[she] asked about working on benches that did not require her to perform manual differentials, she was told that was not an

option," ECF 41, at 23 (citing ECF 41-2, at 3–4 ¶ 13), "[n]o one from UMCRH reached out to

Jenkins to clarify the[] [physician] recommendations," but instead Defendant "added 3 minutes

per question to the timed test it decided to administer," *id.* at 24, and Defendant "never explained

why it withdrew its decision to provide further training to Jenkins." *Id.* As an initial matter, there

is no record evidence showing that there were Med Tech positions that did not require calling

slides. Plaintiff asserts that there were such positions, but provides no evidence, aside from her

own opinion, to support the assertion. *See CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir.

2020). In addition, Plaintiff's contention that no one reached out to clarify the accommodations is

belied by record evidence showing that Kiptepkut met with Plaintiff in either November 2019 or

January 2020 to discuss her accommodation form and request additional paperwork, and once the

proper forms were submitted, Defendant permitted Plaintiff to sit for another assessment with her

requested testing accommodations, which as discussed, she still failed. *See* ECF 39-2, at 57,

199:3–21, at 60, 222:10–17 (testimony by Plaintiff that she met with Kiptepkut "previously" about

her requested accommodations and "recall[ed] a request for additional paperwork"); ECF 39-22,

at 2 (email from Kiptepkut to Fisher and Jones-Walker explaining that Plaintiff "did not share []

how she was accommodated in the past by previous employers" but asked "for more time [to] be

able to complete her duties").

    Additionally, Plaintiff's assertion that the lack of retraining was retaliatory is not supported

by the record, which shows that after Plaintiff formally requested accommodations in November

2019, Awojoodu, consistent with UMCRH's Reasonable Accommodation of Individuals with

Disabilities Policy, immediately notified Human Resources Manager Jones-Walker and Employee

Health Nurse Dailey of Plaintiff's communication and request. *See* ECF 39-5, at 5–6 ¶ 25; *see

also* ECF 39-17, at 2; ECF 44-17, at 6, 68:9–18 (testimony by Awojoodu that she "consulted HR,

and based on what was said, there's a possibility of – during the conversation requesting accommodation. I had to wait for whichever way HR said we should go, so there was no training after this. We decided to repeat the competency."). After receiving the accommodation form and supporting medical documentation, which requested more time to take competency assessments, ECF 39-16, at 2, Defendant granted Plaintiff extra time and administered another competency assessment in which she received three additional minutes per slide. ECF 41, at 16–17; ECF 39-26, at 2. While the manual indicated that the hospital would retrain employees who failed competency assessments, Plaintiff's requested accommodation did not indicate she needed additional training, but rather needed additional time to process slides in a testing environment. ECF 39-16, at 2. As is well-established, Defendant granted the request for additional time.

Even after it was clear that Plaintiff could not perform an essential function of her position with a reasonable accommodation, *see* ECF 39-8, at 6 ¶ 21; ECF 39-2, at 71, 244:6–13, Defendant continued to work with Plaintiff and identified a possible alternative position within the hospital system.[24] *See* ECF 39-2, at 77, 253:7–254:16; ECF 39-26, at 3. In light of the above, Plaintiff fails to establish that Defendant's purported basis for terminating her was merely a pretext for discrimination.

4.    Retaliation (ADA)

To succeed on a retaliation claim brought under the ADA, a plaintiff must show: "(1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." *Laird v. Fairfax Cnty Va.*, 978 F.3d 887, 892 n.4 (4th Cir. 2020) (quoting *Laber v. Harvey*, 438

---

[24] Plaintiff does not dispute that Defendant offered Plaintiff an alternative position, but asserts that the position was as a phlebotomist, and Defendant "did not provide any details as to where the position would be located or the hourly rate." ECF 41, at 24.

F.3d 404, 432 (4th Cir. 2006)).  After a plaintiff proves a prima facie case of retaliation, "[t]he burden then shifts back to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).  If the defendant offers a legitimate, non-discriminatory reason for the adverse employment action, then Plaintiff must prove that the proffered reason is merely pretextual. *Brockman v. Snow*, 217 F. App'x. 201, 207, 208 n.6 (4th Cir. 2007).

Plaintiff alleges that the protected activity at issue was her November 14, 2019 request for an accommodation.  A request for accommodation qualifies as protected conduct. *See Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001) (holding that an accommodation request constitutes protected activity that may sustain a retaliation claim); *Leckie v. Bd. of Educ. of Montgomery Cnty.*, Civ. No. TDC-23-0299, 2023 WL 8809310, at *7 (D. Md. Dec. 19, 2023) (holding that "for purposes of a retaliation claim, an employee's request for reasonable accommodations is a protected activity").  Additionally, Plaintiff's termination qualifies as an adverse employment action. *See Chang Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018) ("'Discharge' from employment is one form of adverse employment action.") (citing *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999)); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 656–57 (4th Cir. 1998) (recognizing discharge as an adverse employment action).  Thus, the only remaining question is whether the protected activity was causally connected to the adverse employment action.

Plaintiff contends that after engaging in the protected activity, Defendant "abruptly withdrew plans to provide additional training on reading differentials," and eventually "agreed to retest Jenkins without the benefit of the retraining mandated in its Policy." ECF 41, at 28. Plaintiff also asserts that Defendant "ignored the testing recommendations provided by her medical

providers and made up its o[w]n testing conditions," before eventually terminating her.  *Id.*

Defendant maintains that "the end of Plaintiff's employment was based on her inability to perform

the essential functions of her job and refusal to accept alternative positions, and nothing more."

ECF 39-1, at 31.

Plaintiff demonstrates a sufficient "causal nexus" for prima facie purposes. *Brockman*, 217

F. App'x. at 207.  As the Fourth Circuit has explained, an "employee need not prove causation

itself" when establishing a prima facie case. *Id.*  Rather, a "close temporal proximity between the

protected activity and the adverse action is sufficient to show a causal nexus." *Id.* (citing *Yashenko*

*v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006)).  Additionally, "[a] plaintiff may

establish the existence of facts that suggest that the adverse action occurred because of the

protected activity." *Roberts v. Glenn Indus. Group, Inc.*, 998 F.3d 111, 123 (4th Cir. 2021)

(quotations and citations omitted).  Here, drawing all reasonable inferences in favor of Plaintiff,

failing to provide training, in contravention of Defendant's own internal policies, shortly after

Plaintiff requested an accommodation, gives rise to a reasonable inference of retaliation.  A

reasonable juror could conclude that failing to retrain Plaintiff before retesting her affected her

performance on the February 2020 assessment, which formed, at least in part, the basis for her

termination in May 2020.[25]  The Court therefore finds that Plaintiff has met her burden to show a

prima facie case of retaliation.

---

[25] The Court notes that Plaintiff was put on administrative leave in December 2019, about a month
after she requested accommodations, was retested for competency in February 2020, about three
months after requesting accommodations, and then was terminated in May 2020, about six months
after requesting accommodations. ECF 39-21, at 2; ECF 39-26, at 2–3. Thus, it is not clear that
Plaintiff has established a temporal relationship between the protected activity (requesting
accommodations) and the adverse action (termination) because the adverse action occurred six
months after the protected activity. *See Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 485–
86 (D. Md. 2015) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (collecting
cases about temporal relationship between protected activity and adverse action and finding that a

The inquiry does not end here, however. After a plaintiff proves a prima facie case of retaliation, "[t]he burden then shifts back to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250. As discussed above, Defendant has offered multiple legitimate, non-retaliatory reasons behind the decision to terminate Plaintiff.

Plaintiff contends that "[i]nstead of allowing [her] to work in a med tech position that did not require her to read differentials it offered her a lower level position and then, asserting that it had met its obligations to provide an accommodation, terminated [Plaintiff] instead." ECF 41, at 28. Defendant asserts that "with or without reasonable accommodations, Plaintiff was never going to be able to perform the essential functions of her job, which was illustrated in the February 2020 assessment wherein she was provided her requested accommodations and still failed." ECF 39-1, at 31–32.

The parties do not dispute that Defendant retested Plaintiff in February 2020 and gave her additional time to call slides on the test and then subsequently offered her an alternative position in the hospital system. *See* ECF 41, at 16, 24; ECF 39-2, at 69, 235:9–19. Even with the requested accommodations, Plaintiff still could not call slides in an accurate and timely manner. ECF 39-26, at 2. Plaintiff was unable to perform the essential functions of a Med Tech, therefore she was not offered a Med Tech position at another location, but UMCRH did offer Plaintiff other

---

gap of three months between the activity and the adverse action was too long a period to support a causal inference). The Fourth Circuit has also held that "a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (quoting *King*, 328 F.3d at 151 n.5). However, given the failure to retrain Plaintiff in accordance with internal policies, the Court will assume that Plaintiff satisfies the requirement of a causal nexus and makes out a prima facie case of retaliation.

opportunities, which she appears to have rejected. ECF 39-2, at 77, 253:7–20; ECF 39-26, at 3.[26] In addition, Jones-Walker's letter to Plaintiff, dated May 22, 2020, listed the following reasons for not allowing Plaintiff to continue working as a Med Tech:

> As a PRN employee, it is expected you would work independently, working shifts unable to be filled with full-time or part-time staff. Management indicates based on the results of your competency examination, you cannot be given the amount of additional time required to correctly interpret slides at Bowie because this would cause delayed results which directly impacts patient care . . . moreover, when provided with additional time and a different environment for testing, you were unable to successfully complete your competency assessment.

ECF 39-26, at 2–3. Thus, Defendant has produced legitimate, non-retaliatory reasons for Plaintiff's termination, specifically that she was unable to perform an essential function of her job even with a reasonable accommodation, and she declined placement elsewhere in the UMCRH system.

Plaintiff fails to offer evidence to rebut Defendant's assertions. Plaintiff's statement that she could remain working as a Med Tech because "[t]here is no record on any instance when [inaccurately calling a slide] occurred in the course of a shift on which Jenkins worked," ECF 41, at 22, is undermined by the record, which shows that Walker discovered that Plaintiff inaccurately called a slide on July 30, 2019. *See* ECF 39-8, at 3 ¶¶ 6, 7. In addition, Plaintiff's unsupported assertion that "there were medical technologist positions that did not require Jenkins to perform manual differentials," ECF 41, at 24, does not show pretext in the absence of Plaintiff citing

---

[26] Specifically, Jones-Walker wrote in her letter to Plaintiff, dated May 22, 2020: "Again, I would like to offer you the opportunity to transfer to another position within the University of Maryland Capital Region Health System. If you are now interested, I would be happy to assist you with that process within the next thirty days." ECF 39-26, at 3.

evidence to confirm that such a position existed.[27]  In short, Plaintiff was terminated because she could not call slides in an accurate or timely manner, which was an essential function of a Med Tech, and she repeatedly failed to follow-up with UMCRH regarding the alternative positions offered to her.  As the Fourth Circuit has made clear, when an employer furnishes a legitimate, non-retaliatory reason for discharge, "it is not [the] province [of a federal court] to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000); *see also Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (explaining that courts do not "sit as a kind of super-personnel department weighing the prudence of employment decisions") (citing *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).  No reasonable juror could find that allowing Plaintiff to retest with her requested accommodations and attempting to find Plaintiff a new position within the hospital system after she failed the second competency assessment, was pretext for retaliation.  In light of the above, Plaintiff establishes a prima facie case of retaliation but cannot rebut Defendant's non-retaliatory explanation for discharge as merely pretextual.  Defendant is thus entitled to judgment as a matter of law on Count III.[28]

---

[27] Plaintiff states that Defendant rejected Plaintiff's "request to be placed in a Med Tech position that did not require reading differentials," ECF 41, at 27, but Plaintiff provides no citation to the record to show that such a position existed.  Plaintiff asserts that, "Walker acknowledged that there were technologists at PG Hospital who worked on dedicated benches or only performed certain testing depending on the complexity," *see id.*, but, as previously explained, the cited portion of Walker's deposition testimony does not appear to support Plaintiff's assertion, and instead reflects a back and forth over the difference between medical technicians and medical technologists without discussing the assertion that there were opportunities for Plaintiff to serve as a technologist without being required to call slides.

[28] The Court notes that Defendant argues in the alternative that it is entitled to partial summary judgment on the issue of damages because Plaintiff allegedly failed to mitigate her damages.  ECF 39-1, at 34.  In light of the Court's finding that Defendant is entitled to summary judgment on the threshold issue of liability, the damages argument is moot, and the Court declines to address it.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment, ECF 38, is

**GRANTED**.

A separate implementing Order will issue.


Dated: <u>January 27, 2025</u>                                          <u>        /s/        </u>
                                                                        Brendan A. Hurson
                                                                        United States District Judge

45